[Cite as *Wilson v. CSX Transp., Inc.*, 2025-Ohio-819.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| EDWARD M. WILSON, | : | APPEAL NO. C-240284 |
| | | TRIAL NO. A-2202320 |
| Plaintiff-Appellant, | : | |
| vs. | : | |
| | | *O P I N I O N* |
| CSX TRANSPORTATION, INC., | : | |
| Defendant-Appellee. | : | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: March 12, 2025

*Daniel J. McCarthy* and *Thomas J. Joyce, III*, for Plaintiff-Appellant,

*Shumaker, Loop & Kendrick, LLP*, and *James R. Carnes*, for Defendant-Appellee.

CROUSE, **Judge.**

{¶1} For decades, plaintiff-appellant Edward M. Wilson repaired tracks for defendant-appellee CSX Transportation, Inc. ("CSX"), a railroad company. The work was hard, and Wilson contends that CSX made it harder by failing to provide him with adequate equipment and assistance. After undergoing surgery and treatment for degenerative knee and spinal injuries and taking disability retirement, Wilson sought relief under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. 51 et seq., which permits railroad employees to recover for injuries caused by the negligence of their employers. Wilson contends that CSX's negligence caused him to suffer cumulative traumatic injuries to his knees and back over a period spanning years, as well as two acute traumatic injuries in 2012 and 2013. The trial court, however, determined that Wilson had not introduced evidence sufficient to raise a jury question on any of his claims and entered summary judgment for CSX.

{¶2} For the reasons set forth below, we agree that CSX was entitled to summary judgment with respect to Wilson's two acute-traumatic-injury claims. Unlike the trial court, however, we hold that Wilson did introduce evidence from which a jury could conclude (1) that CSX was negligent in failing to furnish Wilson with certain equipment, and (2) that CSX's failure in this regard played some part in causing or aggravating Wilson's degenerative knee and spinal conditions. We therefore reverse the trial court's summary judgment with respect to those issues and remand the cause so that Wilson may proceed to trial on his cumulative-traumatic-injury claim under that theory.

## I. BACKGROUND

{¶3} Wilson worked for CSX and its predecessor—both railroad companies—from 1978 to 2014. He spent the first two of those years working as a "trackman" (i.e.,

a track repairperson) before working as a welder helper and then as a track welder from 1980 on.

{¶4} Wilson's jobs with CSX involved intensive manual labor, including repeated lifting, squatting, and carrying heavy objects. Wilson testified in a deposition that the strain of these tasks was amplified by CSX's failure to furnish him with requested tools or to repair those he already had. For example, Wilson contended in his deposition testimony that he was given a new truck in 2009, but that "the boom on the truck"—i.e., the mounted crane used to lift heavy objects—"didn't work half the time."[1] Wilson testified that, on the frequent occasions when such equipment was broken, he was forced to lift items of up to 100 pounds into and out of his truck bed. Wilson testified that he had reported his equipment issues to CSX, but to no avail.

{¶5} Wilson further testified that the strain on his body was amplified by the inadequate assistance of his assigned welder helper, Teddy. During "the last six, seven years" of his time at CSX, Wilson testified, Teddy had been his welder helper "almost half the time." But Teddy, Wilson said, "was just a terrible helper." Wilson testified, for example, that "Teddy never did help [Wilson] pick up that surface grinder unless a boss was in front of him." Wilson testified that he had made his issues with Teddy known to his supervisors at a meeting a few months before his disability retirement.

{¶6} Throughout his years working on the railroad, Wilson incurred numerous injuries. Prior to 2012, Wilson generally reported these injuries to his employer. In many of the reported cases, Wilson and his employer reached settlement agreements that provided Wilson with compensation.

---

[1] In the same deposition passages addressing his boom issues, Wilson also testified about a broken "Tommy gate" on his truck. His briefs to this court, however, have discussed only the boom issue, and make no mention of the "Tommy gate." We therefore address only the broken boom.

{¶7} After 2012, Wilson contends he suffered two injuries, which he did not report. These injuries are the basis for two of Wilson's claims in this case.

{¶8} While working on November 20, 2012, Wilson put a pair of joint bars in the bed of his work truck. (Joint bars are the large metal pieces that serve to connect one piece of metal rail on a railroad track to the next.) While Wilson testified that some of his coworkers' work trucks had storage racks for securing such bars, Wilson's work truck did not. When Wilson climbed into the bed of his truck to change the gauge on his oxygen tank for his welding equipment, he tripped over the bars, fell, and felt pain in his right knee. Wilson did not report the injury to CSX initially. When Wilson went to an orthopedic surgeon, Dr. Larkin, over a week later, he told the doctor that he had injured his knee working in his garage. Wilson later testified that he had hidden the work-related cause of his injury from CSX and his doctor because he had feared retaliation from his employer.

{¶9} Wilson returned to work and, on January 24, 2013, was sent out to make a weld on a section of rail. The portion of rail Wilson was to weld was on top of a tie—one of the wood pieces set in the ground every couple of feet, underneath and perpendicular to the metal rails of a railroad. The foreman apparently had concerns about the placement, and so pulled the tie part of the way out from under the rail. This left a hole in the ground where the tie had been, which Wilson estimated was around 18 inches deep. To make his weld, Wilson had to get under and/or on top of the rail, which, in turn, required crouching, kneeling, standing, and climbing into and out of the hole. At some point, Wilson "felt something in [his] knee again." Nevertheless, Wilson finished the job, and "went on home hurting." The next day, Wilson's knee "just went out all the way." Again Wilson testified that he did not report the injury to CSX and again lied to his doctor about the triggering event.

**{¶10}** Wilson underwent a right knee replacement in March 2013. Following the procedure, Wilson returned to work for a five-month period, before being taken out of service in January 2014. During his return, Wilson began to develop back and neck pain.

**{¶11}** Wilson took disability retirement in May 2014. Then, in June 2022, he filed a complaint against CSX in the Hamilton County Court of Common Pleas, asserting three FELA claims.[2] Following the close of discovery, CSX moved for summary judgment. The record for summary judgment contained not only the two depositions of Wilson and Wilson's medical records, but also affidavits from two of his treating physicians, Dr. Larkin and Dr. Kakarlapudi, and a "Safety Analysis & Expert Report" regarding conditions at CSX, authored by Peter F. Kelly, a certified safety professional. The trial court granted summary judgment for CSX on all claims, from which Wilson took this timely appeal.

## II. ANALYSIS

**{¶12}** On appeal, Wilson raises a single assignment of error: that the trial court should not have granted summary judgment to CSX on his claims under FELA.

**{¶13}** Congress enacted FELA in 1906 "to provide a federal remedy for railroad workers who suffer personal injuries as a result of the negligence of their

---

[2] Wilson initially filed his complaint against CSX in Pennsylvania's Philadelphia County Court of Common Pleas in 2015. *See Wilson v. CSX Transportation, Inc.*, Philadelphia, Penn., C.P. No. 151102678 (Nov. 18, 2015). CSX moved for dismissal on the grounds of forum non conveniens, which was denied. *Id.* An appellate court reversed this denial, but no stipulated dismissal was entered on the Pennsylvania trial court's docket at first. On February 5, 2020, the Pennsylvania court administratively dismissed the action. Wilson filed a complaint in the Hamilton County, Ohio, Court of Common Pleas in January 2021. *See* Complaint, *Wilson v. CSX Transportation, Inc.*, Hamilton C.P. No. A-2100375 (Jan. 29, 2021). Due to confusion or complications regarding the dismissal of the Pennsylvania case and the statute of limitations, Wilson dismissed his Ohio complaint without prejudice in May 2022. *See* Notice of Dismissal, *Wilson*, Hamilton C.P. No. A-2100375 (May 31, 2022). But, while this was happening, the administrative dismissal in Philadelphia was vacated, and a new stipulated dismissal was entered on April 5, 2022. New stipulation in hand, Wilson refiled his complaint in the instant action on June 28, 2022.

5

employer or their fellow employees." (Footnotes omitted.) *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 561 (1987). To effectuate its remedial purpose, FELA's coverage "is defined in broad language, which has been construed even more broadly." *Id.* at 561-562.

**{¶14}** At the heart of FELA is a straightforward instruction imposing federal liability upon certain railroads:

> Every common carrier by railroad while engaging in commerce between any of the several States . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. 51. Put simply, "FELA renders railroads liable for employees' injuries or deaths 'resulting in whole or in part from [carrier] negligence.'" (Bracketed text in original.) *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 688 (2011), quoting 45 U.S.C. 51.

**{¶15}** FELA incorporates numerous concepts familiar from common-law negligence actions. To "prevail on a FELA claim, a plaintiff must prove the traditional common law elements of negligence: duty, breach, foreseeability, and causation." (Cleaned up.) *Vance v. Consol. Rail Corp.*, 73 Ohio St.3d 222, 230 (1995). But rather than incorporate the negligence law of any particular state to define these elements, FELA comes with its own federal rules of decision and decisional law, so that "'[s]tate laws are not controlling in determining what the incidents of this federal right shall

be.'" *Hess v. Norfolk S. Ry.*, 2005-Ohio-5408, ¶ 18, quoting *Dice v. Akron, Canton & Youngstown RR. Co.*, 342 U.S. 359, 361 (1952).

{¶16} For example, the "foreseeability" component of a FELA claim does not translate to common-law "proximate cause." In FELA actions, foreseeability only factors into defining whether the railroad *has breached its duty* to its employee. Thus, in resolving whether an employer has "fail[ed] to observe that degree of care which people of ordinary prudence and sagacity would use under the same or similar circumstances," a court or jury should consider "what a reasonably prudent person would anticipate as resulting from a particular condition." *Gallick v. Baltimore & Ohio RR. Co.*, 372 U.S. 108, 118 (1963).

{¶17} The text of FELA supplies a causation standard more liberal than the common law. If an employer has breached its duty under the act by failing to take such care, and if that negligent conduct "is shown to have *played any part, even the slightest, in producing the injury*, then the carrier is answerable in damages even if the extent of the injury or the manner in which it occurred was not probable or foreseeable." (Cleaned up.) (Emphasis sic.) *McBride*, 564 U.S. at 703-704; *see also Rogers v. Missouri Pacific RR. Co.*, 352 U.S. 500, 506 (1957). The imposition of any further proximate-cause requirement drawn from the common law is inconsistent with FELA's "text and purpose." *McBride* at 688. Thus, "[j]udicial appraisal of the proofs [in a FELA action] to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all in the injury or death." *Rogers* at 506-507.

{¶18} In this appeal, Wilson contends that the trial court erred by granting CSX summary judgment on his three FELA claims. The first claim in Wilson's

complaint alleged that CSX's negligence caused him to suffer a cumulative traumatic injury. The second alleged that CSX's negligence caused him to suffer an acute traumatic injury when, on November 20, 2012, he tripped on a joint bar in the bed of his truck. And Wilson's third claim alleged that CSX's negligence caused him to suffer another acute traumatic injury on January 24, 2014, when he twisted his knee while working on a welding job from inside an 18-inch hole. These three claims correspond to the three issues presented by Wilson for review under his assignment of error.

### A. Standard of Review

{¶19} Though they are governed by federal substantive law, "[g]enerally, 'FELA cases adjudicated in state courts are subject to state procedural rules.'" *Vance*, 73 Ohio St.3d at 227, quoting *St. Louis S.W. Ry. Co. v. Dickerson*, 470 U.S. 409, 411 (1985); *accord Miller v. CSX Transp., Inc.*, 2007-Ohio-5470, ¶ 7 (6th Dist.). "Thus, we look to Ohio's rules regarding summary judgment" in considering Wilson's FELA claims, while applying "the liberal standard of negligence under the statute." *Maret v. CSX Transp.*, 130 Ohio App.3d 816, 820-821 (1st Dist. 1998).

{¶20} "When reviewing the decision of a trial court granting or denying a party's motion for summary judgment, an appellate court applies a de novo standard of review." *Smathers v. Glass*, 2022-Ohio-4595, ¶ 30, citing *A.J.R. v. Lute*, 2020-Ohio-5168, ¶ 15. A court may award summary judgment to a moving party who can show (1) "that there is no genuine issue as to any material fact," (2) "that the moving party is entitled to judgment as a matter of law," and (3) that "it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to" the nonmoving party. Civ.R. 56(C); *accord Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996).

{¶21} Ohio courts determine whether these criteria are met by applying a burden-shifting framework. First, the moving party must "inform[] the trial court of the basis for the party's motion and identify[] those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claim." *Midland Credit Mgt., Inc. v. Naber*, 2024-Ohio-1028, ¶ 6 (1st Dist.), citing *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). Once the moving party has cleared this hurdle, the burden shifts to the nonmoving party to identify "specific facts showing that there is a genuine issue for trial," Civ.R. 56(C), which must be based on more than "unsupported allegations or the pleadings." *Smathers* at ¶ 31, citing *Lute* at ¶ 26. Only if the nonmoving party fails to meet this second requirement is summary judgment appropriate under Civ.R. 56.

### B. Cumulative-Traumatic-Injury Claim

{¶22} In the first count of his complaint, Wilson alleged that "over the course of his career with [CSX], [Wilson] developed injuries to his bilateral knees, low back and neck," which he alleged were "caused, contributed to and/or aggravated, worsened, exacerbated, in whole or in part, by the negligence" of CSX. His complaint also offered several theories as to how CSX had negligently caused his injuries. Wilson now appeals the trial court's summary judgment for CSX on this claim.

{¶23} There is no per se bar on cumulative-injury claims under FELA. The Sixth Circuit has considered and permitted multiple cases to go to a jury on theories that carriers contributed to employees' long-term, cumulative harms, like carpal tunnel syndrome, by regularly requiring them to employ some ergonomically deficient tool or perform some ergonomically problematic task. *See, e.g.*, *Aparicio v. Norfolk & W. Ry.*, 84 F.3d 803, 812 (6th Cir. 1996) (reversing judgment as a matter of law because railroad could have foreseen that plaintiff's "job duties put him at risk for

9

developing a cumulative trauma disorder such a[s] carpal tunnel syndrome”); *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255 (6th Cir. 2001) (reversing summary judgment for railroad on plaintiff’s claim that railroad’s negligence contributed to his carpal tunnel syndrome). And the United States Supreme Court, over 75 years ago, approved a cumulative-injury claim brought by an employee who asserted that years-long workplace exposure caused him to contract silicosis. *Urie v. Thompson*, 337 U.S. 163 (1949).

{¶24} But cumulative-injury claims are no different from other FELA claims—the plaintiff must still show (1) that the defendant-railroad behaved negligently by breaching its duty of care, and (2) that said “employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought.” *Rogers*, 352 U.S. at 506. Thus, the question in this appeal is whether, on the summary-judgment record before us, evidence exists to support the conclusion that (1) CSX failed to take the actions of a reasonably prudent employer under the circumstances, and (2) the identified transgression was *a* cause, no matter how slight, of Wilson’s complained-of cumulative-trauma injuries.

{¶25} To support the cumulative-trauma claim, Wilson argues that CSX was negligent in essentially three ways: (1) by failing to furnish him with adequate equipment, (2) by failing to provide him with adequate assistance, (3) by failing to perform risk assessments and offer adequate trainings or warnings to address the risks of Wilson’s day-to-day job activities.

### 1. *Failure to Provide Adequate Equipment*

{¶26} In support of his first theory, Wilson points to his deposition testimony regarding the nonfunctioning boom (crane) on his work truck. Wilson contends, and his testimony supports, that the boom was meant “to assist him moving and operating

heavy equipment." For example, Wilson's testimony suggests that workers would use the boom to lift oxygen tanks into and out of the beds of their work trucks. In his deposition, Wilson estimated that such tanks were "about 5 feet 5" and "weigh[ed] right at a hundred pounds, if not over." Hence, when welders needed to place the oxygen tanks into their trucks, they used their booms. In fact, Wilson testified that CSX had trained him to use his boom to lift such heavy objects.

{¶27} But Wilson testified that the boom on his truck "didn't work half the time." Because his boom would "quit working" and "break down on [him]" as he tried to use it to lift objects, Wilson felt he "couldn't trust it." Wilson asserted that booms had been a problem on all the trucks CSX had provided him.

{¶28} When stuck with "a boom that wouldn't work," Wilson testified that he and his helper were forced to lift the oxygen tanks and other heavy equipment into the truck bed by hand. With respect to the oxygen tanks in particular, Wilson testified that one person "would get up in the truck and pull on the top of the tanks," while the other would remain on the ground to "help boost them up." Wilson testified that he believed that the strain required "to put those [oxygen] tanks on the back of the pickup truck by hand" wore on his body and contributed to his injuries.

{¶29} Wilson testified that he complained to his supervisors about his need for adequate equipment. Yet, Wilson testified, he continued to have problems with his boom.

{¶30} Contrary to the trial court's conclusion, we hold that the foregoing testimony constituted sufficient evidence from which a jury could conclude that CSX had been negligent in failing to provide Wilson with a working boom. Wilson was given booms on his trucks "from day one," and CSX trained him to use those booms to lift heavy objects into the truck bed. The universality of this piece of equipment, along

with the training regarding its use, suggest that even CSX viewed the boom as essential to the safe performance of Wilson's job.

{¶31} Yet Wilson testified his boom frequently failed him, and that, despite complaints, CSX failed to provide him with a consistently working boom. As a result, he was forced to engage in activities that were obviously strenuous—including lifting 100-pound oxygen tanks into a truck bed. If a jury believed Wilson, it could reasonably find that, by failing to repair the boom and leaving Wilson and his helper to lift such items manually, CSX had breached its duty to provide Wilson with the equipment necessary to perform his work tasks safely.

{¶32} Wilson also provided evidence from which a jury could conclude that the malfunctioning boom "played any part, even the slightest, in producing [his] injury." (Cleaned up.) *See McBride*, 564 U.S. at 703. In support of his response opposing CSX's motion for summary judgment, Wilson submitted affidavits from two of his treating physicians: Drs. Larkin and Kakarlapudi. Dr. Larkin, who performed Wilson's knee operations in 2013, averred that he believed, to "a reasonable degree of medical certainty," that "Wilson's excessive physical labor at the railroad was a contributing factor in the development of his right knee degenerative joint disease," and that it "aggravated and worsened" that condition. Dr. Kakarlapudi, who performed procedures on Wilson's neck and back in 2014, likewise averred that "excessive physical labor at the railroad" had contributed to, aggravated, and worsened Wilson's "cervical degenerative disc disease."

{¶33} These affidavits were sufficient to create a genuine dispute as to whether the physical burden imposed by having to lift 100-pound tanks "played a part—no matter how small—in bringing about" Wilson's neck, back, and knee injuries. (Cleaned up.) *See McBride* at 703, fn. 13. While the doctors' affidavits do not speak specifically

to the broken boom, a jury could reasonably infer that the need to lift such heavy equipment into and out of the truck constituted part of the "excessive physical labor" that the doctors aver contributed to his degenerative knee, back, and neck conditions.

**{¶34}** CSX counters that FELA does not permit Wilson to "recover simply because of conditions encountered as part of his job requirements." *See Potrykus v. CSX Transp., Inc.*, 2010 U.S. Dist. LEXIS 73722, *10 (N.D.Ohio Jul. 21, 2010), citing *Stevens v. Bangor & Aroostook RR.*, 97 F.3d 594, 598 (1st Cir. 1996). It is certainly true that FELA, "unlike workmen's compensation statutes, does not make the employer an insurer," and that a "FELA plaintiff is not entitled to absolute security" on the job. *Conway v. Consol. Rail Corp.*, 720 F.2d 221, 223 (1st Cir. 1983), citing *Inman v. Baltimore & Ohio RR.*, 361 U.S. 138, 140 (1959). Rather, a FELA plaintiff must show *negligence*. Thus, a worker whose ordinary job duties have caused him to suffer long-term degenerative injuries can prevail in a FELA suit only if the railroad breached its duty to act as a reasonable employer in "creating a reasonably safe working environment." *Darrough v. CSX Transp., Inc.*, 321 F.3d 674, 676 (7th Cir. 2003). It is not enough for a FELA plaintiff to show that their "working environment could have been safer." *Id.*

**{¶35}** Three cases from the Seventh Circuit illustrate this line. In *Walker v. Northeast Regional Commuter RR. Corp.*, 225 F.3d 895, 896 (7th Cir. 2000), a FELA plaintiff sought to recover for injuries he experienced during a two-person lift of a 140-pound blade for a piece of equipment. The plaintiff asserted that the workplace had been negligently arranged so that he was prevented from using the crane or forklift to do the lift, and that the railroad had been negligent in requiring him to lift more than 50 pounds. *Id.* at 897. The trial court granted the railroad's motion for summary judgment, and the Seventh Circuit affirmed, holding that the plaintiff had failed to

introduce evidence that the single lift was not reasonably safe. *Id.* at 897-899.

**{¶36}** In reaching this determination, the appellate court distinguished two of its prior FELA decisions. In one, the court had upheld a FELA verdict for an employee who, at the instruction of the railroad, "was continually lifting a heavy load," which the railroad could have alleviated by providing him with a crane or additional workers. *Heater v. Chesapeake & Ohio Ry. Co.*, 497 F.2d 1243, 1247 (7th Cir. 1974). And in the other, the court had reversed a summary judgment for a railroad, because the evidence had showed that the railroad had proven "[i]mpervious to repeated complaints of inadequate ventilation" and had refused to implement equipment to better clean the air. *Harbin v. Burlington N. RR. Co.*, 921 F.2d 129, 131 (7th Cir. 1990).

**{¶37}** According to the *Walker* court, *Heater* and *Harbin* were distinguishable because in those cases there was evidence that the plaintiffs' injuries had been preventable and the railroads should have known better. In *Heater*, for example, the evidence showed that the plaintiff had been called on to lift objects even heavier than Walker had and to do so "continually," whereas Walker had only been required to perform the single manual lift by an unfortunate set of circumstances. *Walker* at 898, discussing *Heater* at 1247. And in *Harbin*, the plaintiff had offered evidence of repeated employee complaints and of alternative safeguards the railroad could have employed, unlike *Walker*, who had offered neither. *Walker* at 898, discussing *Harbin* at 131.

**{¶38}** As we have already discussed, Wilson contends that he was regularly and repeatedly required to lift 40- to 100-pound equipment into his truck without mechanical assistance and with a single helper. Wilson was supposed to have used a boom to perform these lifts, rather than doing so by hand—indeed, he testified that he was trained to do so. Wilson testified that his boom regularly malfunctioned, that he

complained about the issue to his supervisors, and that CSX nevertheless failed to provide him with a working boom. As such Wilson, like the *Heater* and *Harbin* plaintiffs (and unlike the *Walker* plaintiff), produced evidence that tended to show not only that Wilson's workplace could have been safer, but that CSX had forced him to engage in repeated unsafe activities by its knowing inaction or ineffective remedial action. In cases where the evidence crosses that threshold, "the issue of negligence is one for juries to determine according to their finding of whether an employer's conduct measures up to what a reasonable and prudent person would have done under the same circumstances." *Wilkerson v. McCarthy*, 336 U.S. 53, 61 (1949).

{¶39} CSX further argues that "neither doctor explains what is meant by 'excessive physical labor' or what would have had to change in order for Wilson's physical labor to not be 'excessive.' And neither provides an opinion that Wilson's labor was unreasonably dangerous to perform." But, taken together, Wilson's testimony and the doctor's affidavits were sufficient to show that CSX's failure to provide Wilson with a consistently functioning boom contributed in some measure to Wilson's injuries. The doctors' affidavits show, as CSX admits, that "Wilson's degenerative medical conditions were related to his work"—specifically, the strain that work put on his body. Being forced to hoist 100-pound tanks by hand, rather than by boom, would certainly have contributed to that strain. The doctors themselves were not required to opine on CSX's duty of care in order to substantiate Wilson's claim of causation.

{¶40} Thus, we hold that disputes of material fact precluded summary judgment for CSX on the issues of whether CSX was negligent in failing to furnish Wilson with a working boom for his work truck, and whether that failure "played any part, even the slightest, in producing" Wilson's degenerative knee and spine injuries.

(Cleaned up.) *See McBride*, 564 U.S. at 703. The trial court therefore erred in categorically granting summary judgment on Wilson's first claim.

### 2. *Failure to Provide Adequate Assistance*

**{¶41}** Wilson's second theory of CSX's negligence concerns Wilson's frequent welder-helper, Teddy. Wilson testified that Teddy "was just a terrible helper," and that Teddy would sometimes refuse to help Wilson unless a supervisor was surveilling him. Wilson testified that Teddy was the "[l]aziest on the job in the whole railroad," and described the travails of working with Teddy as follows:

> A. He—he just—now, he—he was the kind of guy that would sit on the back bumper and watch you unless you got in [sic] him and—and told him to get to work or—and—and if you did get on him and tell him to go to work, he—he didn't want to do it and he—he didn't do it.
>
> Q. Okay. So what kind of things would you have to do then?
>
> A. Well, I would do my work and—and his work.
>
> Q. Okay. Well, what would that be? I mean, what work of his were you doing?
>
> A. Pulling spikes. I—I would—on—on a—when I had other helpers, I pulled about half the spikes. And then I had him, I would pull over half the spikes and—but I was—you know, and I had to tell him every bit what to do and everything.
>
> . . .
>
> Q. In other words, is the complaint that you had to pull more spikes because Teddy wasn't doing it?
>
> A. Yes, sir. I would—I would pull half of his spikes, too.

**{¶42}** Wilson testified that he only raised concerns about Teddy to a

supervisor on one occasion, during a morning job briefing roughly four months before Wilson took disability retirement (and *after* his knee surgery). According to Wilson, he told Teddy and the supervisor that Teddy needed to "get the lead out of his butt," and the supervisor responded that Wilson should not speak that way to Teddy. Wilson also testified that other welders had complained about Teddy's substandard performance, but he provided as his only example an instance when two workers "took [Teddy] to the office for smelling so bad," in order to make him "take a bath." Wilson further testified that older foremen for whom Teddy had worked would "talk about it," and that "[e]verybody knew how bad Teddy was."

**{¶43}** Wilson argues that the railroad's failure to provide Wilson with better welder helpers increased the strain of his work and constituted negligence. Courts have accepted negligent or deficient staffing as a theory of liability under FELA in limited contexts. Eighty years ago, for example, the United States Supreme Court held that a jury could find an employer negligent for failing to provide adequate assistance to help move "a greased, 1000-pound steel tube, 30 feet in length." *Blair v. Baltimore & Ohio RR. Co.*, 323 U.S. 600, 604 (1945).

**{¶44}** But the negligent-staffing cases suggest that an employer only has a duty to provide additional or better assistants if the tasks at issue are themselves inherently dangerous, such that no reasonable employer would allow them to be performed without additional hands. "An employer is not required to provide an employee with additional help simply to make his tasks easier. A task must be inherently unsafe for an employer to be negligent for failing to provide additional help." (Citations omitted.) *Miller*, 2007-Ohio-5470, at ¶ 13 (6th Dist.). Thus, courts have drawn a line between, on the one hand, an injury suffered by an employee who was left alone to move a "55 gallon oil drum, weighing about 600 pounds," and, on the other, a shoulder injury

17

sustained by a worker engaged in the ordinary task of driving spikes, whose job would have been less onerous with greater assistance. *Compare Ross v. Chesapeake & Ohio Ry. Co.*, 421 F.2d 328, 329 (6th Cir. 1970), *with McKennon v. CSX Transp.*, 897 F.Supp. 1024, 1027 (M.D.Tenn. 1994), *aff'd*, 56 F.3d 64 (6th Cir. 1995).

**{¶45}** Wilson can point to no evidence in the summary-judgment record that CSX breached its duty of care in failing to provide him with adequate assistance. The issue is one of foreseeability. A FELA defendant's "duties are measured by what is reasonably foreseeable under like circumstances—by what in the light of the facts then known, should or could reasonably have been anticipated." (Cleaned up.) *McBride*, 564 U.S. at 703, quoting *Gallick*, 372 U.S. at 118. In other words, Wilson's deficient-assistance theory requires him to show that CSX or its agents should have known of Teddy's deficient assistance and should have foreseen that it would lead to an employee's injury.

**{¶46}** But Wilson's evidence suggests the opposite. Wilson did testify that Teddy failed to assist him in lifting heavy equipment, such as the "surface grinder," which weighed 40 pounds. Yet Wilson also testified that, when supervisors were watching, Teddy became an efficient and useful helper. Thus, the only way for CSX to have notice of Teddy's unwillingness to work would have been if Wilson had reported it.

**{¶47}** Wilson testified that he complained of Teddy's performance only once, only indirectly, and only in the final months of his career. His complaint came four months before his departure—and *after* the injuries of which he now complains. Further, Wilson did not tell his supervisor that Teddy was failing to assist him with heavy lifts. Rather, Wilson simply told Teddy to "get the lead out of his butt," i.e., to pick up the pace and show initiative, in the hearing of his supervisor.

18

**{¶48}** Further, while Wilson attested that Teddy's laziness was common knowledge, he offered no evidence that anyone knew Teddy was leaving his work partners to perform two-person lifts singlehanded. In fact, the only example Wilson provided when discussing other welders' formal complaints about Teddy was an instance in which welders had complained about Teddy's odor.

**{¶49}** In essence, Wilson alleges that CSX was negligent for not firing Teddy, or else for not providing Wilson with a better welder helper. But without knowledge of Teddy's refusal to assist Wilson in any inherently dangerous activities, CSX had no duty to take such steps. Wilson simply has not offered evidence that, prior to Wilson's injury, CSX knew or should have known that Teddy's assistance was so deficient as to put any welder he worked with in harm's way.

**{¶50}** Because Wilson failed to carry his burden to show that CSX breached its duty of care by allowing Teddy to continue working with Wilson, we hold that the trial court correctly granted summary judgment for CSX on that issue.

### 3. Failure to Assess/Train/Warn

**{¶51}** The remainder of Wilson's theories of negligence under his cumulative-traumatic-injury claim come from the safety report of Wilson's expert, Peter F. Kelly. Based on that report, Wilson contends that CSX was negligent in (1) failing to perform job hazard analyses ("JHAs") to assess the safety of Wilson's work, (2) failing to provide Wilson with adequate safety training, and (3) failing to provide adequate warnings of the safety risks attending certain actions.

**{¶52}** Even assuming that all three deficiencies constituted negligence on the part of CSX, Wilson failed to point to any evidence that such negligence contributed to his injuries.

**{¶53}** At bottom, the problem is that Wilson hasn't shown what any of the

precautionary measures he complains of would have changed. Kelly's report does not explain, for example, what any JHAs would have said. According to Kelly, "JHA initiatives begin with a comprehensive assessment of employee jobs, the major steps to the job, identifying any physical and health hazards associated with each step, and, most importantly, the controls used to mitigate/minimize job risk." Without knowing what hazards the JHAs would have disclosed with respect to Wilson's tasks, or what mitigation measures they would have suggested, we cannot know whether the *lack* of JHAs contributed to Wilson's injuries.

{¶54} Similar rationales apply to Wilson's failure-to-train and failure-to-warn theories of negligence. The Kelly report does not disclose what warnings and trainings *should have* been provided, nor whether those warnings or trainings would have prompted action that might have reduced the likelihood or severity of Wilson's knee, neck, or back injuries. Without evidence that the warnings or trainings would have prompted Wilson to act differently, we cannot know whether they would have had any impact on him, nor whether that impact would have mitigated his injuries.

{¶55} Even assuming that Kelly's report showed that CSX was negligent in failing to perform JHAs, offer certain trainings, and provide certain warnings, Wilson failed to show that any of these deficiencies played a part, no matter how small, in causing or aggravating his complained-of injuries. Thus, the trial court was correct to enter summary judgment in CSX's favor on these issues.

### C. Incident on November 20, 2012

{¶56} Wilson's next FELA claim concerned an alleged injury to his right knee, sustained after tripping over loose joint bars stored in the back of his work truck on November 20, 2012. Wilson contends that CSX was negligent in failing to furnish his truck with a storage rack to gather and hold the joint bars, and that this negligence

contributed to his tripping, falling, and injuring his knee.

{¶57} The trial court rejected this claim because Wilson never reported his injury to his workplace, and told his doctor it had occurred several days later while at home. The trial court acknowledged that, in his deposition, Wilson had explained he had not come forward for fear of workplace retaliation. But the court did not credit this rationale, as Wilson had "made at least five reports of injuries and received cash settlements over the course of his employment" and "there is no evidence in the record to suggest that the injury happened during work."

{¶58} The trial court's determination that Wilson lied in his deposition testimony rested on a determination regarding his credibility, and where "resolution of [a] factual dispute will depend, at least in part, upon the credibility of the parties or their witnesses, summary judgment . . . is inappropriate." *Turner v. Turner*, 67 Ohio St.3d 337, 341 (1993). Wilson testified that he told his wife about his knee injury upon returning home from work on November 20, and that he had subsequently lied to his doctor. If a jury found Wilson credible, it could believe his injury occurred at work and that he had lied to his doctor. If, like the trial court, a jury found his story incredible in light of his prior workplace complaints, then it would rule against him. The trial court, however, was not entitled to weigh the evidence and make such credibility determinations at the summary-judgment stage.

{¶59} Nevertheless, after reviewing the summary-judgment record de novo and properly drawing inferences in Wilson's favor, we conclude that CSX was entitled to summary judgment on Wilson's claim relating to his November 20, 2012 injury, because Wilson had failed to introduce evidence that any alleged negligence on CSX's part caused the injuries of which he now complains.

{¶60} Wilson's complaint alleged that "[a]s a result of [CSX's] negligence,

21

[Wilson] sustained injuries to his right knee on November 20, 2012." He further alleged that, as a result of that injury, he "lost time from work and lost wages," "required medical treatment and medical care and incurred medical bills and medical expenses," and "sustained pain and suffering, mental anguish, and loss of enjoyment of life."

{¶61} But the only injuries substantiated by record evidence were Wilson's "right knee degenerative joint disease" and his "cervical degenerative disc disease," as set forth in his doctors' affidavits. These are the ailments for which Wilson apparently took time off work and received extensive medical care.

{¶62} In their affidavits, Wilson's doctors did not aver that these ailments were caused, aggravated, or facilitated by any acute traumatic incident, but by "excessive physical labor at the railroad." Thus, we have no evidence in the record that Wilson's acute traumatic injury—the tripping and falling in the bed of his truck—was linked to the degenerative conditions for which he seeks to recover.

{¶63} Even assuming that CSX was negligent in failing to furnish Wilson with a truck that had a rack for holding joint bars, Wilson has nevertheless failed to carry his burden to introduce evidence of causation. He provides no evidence that his November 20 trip-and-fall played a part in the degenerative conditions for which Wilson now seeks to recover. Without evidence of that causal connection, CSX was entitled to, and the trial court properly granted, summary judgment on Wilson's November 20, 2012 acute-traumatic-injury claim.

### D. Incident on January 24, 2013

{¶64} Wilson's third and final FELA claim concerns injuries he allegedly sustained as a result of an incident on January 24, 2013, when Wilson was working from inside a hole that had been left when his foreman had removed a railroad tie. No

22

single traumatic event or movement appears to have triggered Wilson's alleged injury on January 24. When asked what event caused his knee injury that day, Wilson testified, "I can't, I can't point it out to one second, just overall down in that hole." But at some point while down in that hole Wilson "felt something in [his] knee again" and "went on home hurting." The next day, Wilson's knee went out.

{¶65} At bottom, Wilson contends his injury stemmed from the stress placed on his knee by having to kneel, bend, and crouch around in the hole left by the tie. Thus, his claim is that CSX, acting through its agents, was negligent in requiring him to perform the weld and repair the track from within the hole left by the removed crosstie and that CSX thereby contributed to his knee injury.

{¶66} The court below granted CSX summary judgment on this claim, partly on the same failure-to-report theory it had applied to his November 20, 2012 claim. That rationale was wrong with respect to this claim for essentially the same reasons it was wrong with respect to the prior claim: it involved weighing the evidence and making credibility determinations inappropriate for summary judgment. *See Turner*, 67 Ohio St.3d at 341-342.

{¶67} This time, however, the trial court included a second basis for rejecting Wilson's claim: that the injury was sustained as a result of "essentially his normal job duties."

{¶68} Jobs involving manual labor always carry *some* risk of injury—this is part of the rationale for workers' compensation laws. The law of negligence does not impose upon an employer a duty to eliminate *all* risk of strain and injury from such jobs. Thus, as we have already noted, a plaintiff cannot ordinarily recover "simply because of conditions encountered as part of his job requirements." *Potrykus*, 2010 U.S. Dist. LEXIS 73722, at *10-11, citing *Stevens*, 97 F.3d at 598; *accord Conway*, 720

F.2d at 223. A railroad worker can only recover under FELA if his injury was a result of railroad *negligence*.

**{¶69}** Wilson contends that the types of movements he was compelled to perform on this date strained his body so as to contribute to his knee injury. But Wilson points to no industry standard instructing that such welds should be completed differently, no evidence that CSX or its agents knew they were subjecting Wilson to an unusually dangerous task, and no suggestion of what CSX should have done instead. In fact, Wilson had no problem with his task:

> Q. Okay. Are you claiming you shouldn't have had to do that on that day in January?
>
> A. No. No, sir. I'm not saying that. That's part of my job.

And while Wilson did tell his foreman that he "d[id]n't have to take that tie off for me," this tells us nothing about whether the foreman was negligent for declining the offer.

**{¶70}** Finally, as with his cumulative-trauma claim, Wilson contends that Kelly's expert report proves CSX's negligence in failing to assess risks, implement protocols, and train employees. But as already discussed, even assuming that all of these omissions constituted negligence on CSX's part, Wilson has again offered no evidence that any protocol, training, or assessment would have kept Wilson from working in that ditch in the manner he did. Without such evidence, we would again be left with a breach of duty and an injury, but no causal link.

**{¶71}** The trial court therefore properly granted summary judgment in favor of CSX on Wilson's third claim.

### III. CONCLUSION

**{¶72}** Wilson introduced evidence sufficient to raise a jury question regarding whether CSX negligently failed to furnish Wilson with a properly functioning boom for

his work truck, and whether, over time, the added physical exertion caused by the lack of a functional boom contributed to Wilson's degenerative knee, back, and neck conditions. We therefore hold that the trial court erred in granting summary judgment for CSX with respect to the truck-boom issue and reverse the trial court's summary judgment as to that issue. However, because Wilson failed to carry his burden with respect to his other cumulative-traumatic-injury theories, as well as his two acute-traumatic-injury claims, we affirm the trial court's summary judgment as to those claims and issues. We overrule in part and sustain in part Wilson's sole assignment of error, and we remand the cause to the trial court for further proceedings consistent with this opinion.

Judgment accordingly.

**KINSLEY, P.J.,** and **ZAYAS, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.